STURZL CONSTRUCTION COMPANY, INC., Appellant, v. CITY OF GREEN BAY, and others, Respondents.

Supreme Court

*No. 76–126. Argued February 27, 1979.—Decided March 27, 1979.*
(Also reported in 276 N.W.2d 771.)

For the appellant there were briefs by *Joseph A. Hoida, Bernard Berk* and *Berk, Pressentin, Hoida & Berk* of Green Bay, and oral argument by *Bernard Berk.*

For the respondents the cause was argued by *Mark A. Warpinski,* assistant city attorney, with whom on the brief was *Richard G. Greenwood,* city attorney.

WILLIAM G. CALLOW, J. The issue presented in this appeal is whether, under the general charter law provisions of Chapter 62, Stats., the Mayor of Green Bay had authority to veto a Common Council action adopting the recommendation of the Board of Public Works to award a repair contract to Sturzl Construction Co., Inc., of Green Bay. We hold that the provisions of sec. 62.15, Stats., relating to the letting of public works contracts, foreclose by necessary implication the exercise of a mayoral veto over a Council action adopting the recommendation of the Board of Public Works.

Sturzl is a masonry construction firm specializing in the installation and repair of streets, sidewalks, and curbings. In 1975 Sturzl and other firms were the subject of a John Doe investigation concerning possible bidrigging in violation of Chapter 133, Stats. During that investigation the city of Green Bay enacted an ordinance containing the following language:

"1.07 (4) (e) Any corporation, firm or individual violating Section 133.01 of the Wisconsin Statutes (1973), or any subsequent amendment thereof, shall upon conviction thereof be thereby disqualified as a bidder on any City of Green Bay project for a period of three (3) years from the date of such conviction; however, nothing herein shall be interpreted to preclude such corporation, firm or individual from completing any and all contracts he may already have with the City at the time of such conviction, nor shall this ordinance be applied retroactively to convictions occurring prior to the adoption and publication of this ordinance. This prohibition applies with like force to officers of convicted corporations, firms or individuals who thereafter have business interest in new corporations or business enterprises of whatever kind or description."

Sturzl entered a plea of nolo contendere to a charge of violating sec. 133.01, Stats. Judgment of conviction was

entered immediately before sec. 1.07 (4) (e) became effective.

Subsequently, Sturzl submitted a sealed bid for a Green Bay street and sidewalk repair contract in April, 1976. The Green Bay Board of Public Works recommended to the Green Bay Common Council that Sturzl, as the low bidder, be awarded the contract. The Council, by a vote of 19 to 5, adopted the Board's recommendation. The Mayor vetoed the Council's approval of the Sturzl contract. The veto letter of May 7, 1976, reads in part as follows:

"President and Members
of the Common Council

"Dear Members of the Council:

"Under the provisions of 62.09 (8) (c) I am returning the below listed resolutions and actions of the Common Council to the City Clerk filing my objections. This constitutes a veto of those actions. Applying my signature to contracts, resolutions, bids, reports on behalf of the people of the City of Green Bay or allowing these to pass without my signature constitutes an endorsement by the Mayor in behalf of the people as to the fiscal responsibility, quality of workmanship and moral integrity of the bidders involved. I must veto the resolutions and certain contracts listed below because I cannot yet assert my acceptance as responsible bidders and quoters all of the firms involved. Further, I cannot by law exercise a partial veto.

"Further, it cannot enhance our civil suit with bid riggers to offer them contracts with our recognition that they are responsible people.

"There are economic pitfalls and practical expediencies at risk, but no one has ever said that the integrity of the people would be cheap. Surely that integrity is worth a one-time risk.

"I, therefore, return to you the following resolutions and actions as vetoed:

". . .

". . .

"A motion to accept the bid of Sturzl Construction Company on sidewalk and pavement repair—1976 as passed at special meeting of the Board of Public Works May 4, 1976."

Council members failed to secure the necessary three-quarters vote to override the veto, voting 15 in favor of overriding, 9 against. The Board readvertised for bids on the contract. Sturzl was underbid by a competitor who was awarded the contract.

Sturzl sought a writ of mandamus to compel the City Clerk, President of the Board of Public Works, and the Mayor to execute the contract with Sturzl. Concurrently Sturzl brought an action seeking specific performance of the Sturzl contract for sidewalk and paving repairs and for an injunction restraining the City from reletting the contract and other just and equitable relief. The actions were consolidated.

From a judgment filed August 9, 1976, quashing the writ and dismissing the complaint, Sturzl appeals, maintaining generally that the Mayor lacked authority to veto the Council action adopting the Board's recommendation that the contract be awarded to Sturzl.

Sec. 62.09 (8) (a) and (c),[1] Stats. 1973, provides:

"(8) MAYOR. (a) The mayor shall be the chief executive officer. He shall take care that city ordinances and state laws are observed and enforced and that all city officers and employes discharge their duties.

"  .  .  .

"(c) He shall have the veto power as to all acts of the council, except such as to which it is expressly or by necessary implication otherwise provided. All such acts shall be submitted to him by the clerk and shall be in force upon his approval evidenced by his signature, or

---

[1] The vote required to override the mayor's veto was reduced from three-quarters to two-thirds of the council, effective May 21, 1976. Chapter 258, Laws of 1975.

upon his failing to approve or disapprove within five days, which fact shall be certified thereon by the clerk. If he disapproves he shall file his objections with the clerk, who shall present them to the council at its next meeting. A three-fourths vote of all the members of the council shall then make the act effective notwithstanding the objections of the mayor."

We are called upon to interpret the legislative intent in the application of the statutory provisions for letting public works contracts and the limitation on the veto authority of the mayor. The mayor's veto power extends to "all acts of the council, except such as to which it is expressly or by necessary implication otherwise provided." Sec. 62.09 (8) (c), Stats. 1973.

The question presented is whether these provisions come within the exception of sec. 62.09 (8) (c), Stats. 1973, and "necessarily imply" a limitation on the mayor's authority to veto acts of the council relating to the award of public works contracts. An appropriate definition of necessary implication is found in *United States v. Jones,* 204 F.2d 745, 754 (7th Cir. 1953) (on petition for rehearing) :

"Necessary implication refers to a logical necessity; it means that no other interpretation is permitted by the words of the Acts construed; and so has been defined as an implication which results from so strong a probability of intention that an intention contrary to that imputed cannot be supported."

The veto power limit must be more than an inference; it must be the only logical inference. In considering whether sec. 62.15, Stats., circumscribes the mayor's veto power over the council's approval of the board's recommendation on a public works contract, the following considerations are important.

The specific procedure governing public works contracts is set forth in sec. 62.15, Stats. In general, public

construction estimated to cost more than $5,000 "shall be let by contract to the lowest responsible bidder." Sec. 62.15(1), Stats.[2] If the work is to be let by contract, the board must prepare specifications, a form of contract and bond, and make them available to prospective bidders. Sec. 62.15(2), Stats. The board then advertises for proposals and receives bids. Sec. 62.15(3), Stats. The board may reject a bid if it believes there has been a "combination . . . to prevent free competition." The council may reject a bid if two-thirds of its members believe the bid to be "fraudulent, collusive, excessive or against the best interests of the city." Sec. 62.15(5), Stats.[3] If the board determines that any bidder is "incompetent or otherwise unreliable for the performance of the work," the board shall report a schedule of all of the bids to the council, together with a recommendation to accept the bid of the lowest responsible bidder. The council may then direct the board to let the work

[2] Sec. 62.15(1), Stats., provides as follows:

"62.15 Public works. (1) CONTRACTS; *How Let.* All public construction, the estimated cost of which exceeds $5,000, shall be let by contract to the lowest responsible bidder; all other public construction shall be let as the council may direct. The council may also by a vote of three-fourths of all the members-elect provide by ordinance that any class of public construction or any part thereof may be done directly by the city without submitting the same for bids."

[3] Sec. 62.15(5), Stats., provides as follows:

"(5) REJECTION OF BIDS. The power to reject any and all bids shall exist unless expressly waived. The board of public works may reject any and all bids, if, in their opinion, any combination has been entered into to prevent free competition. The council may, if it be of the opinion that any of the bids are fraudulent, collusive, excessive or against the best interests of the city, by resolution adopted by two-thirds of its members, reject any or all of the bids received and order the work done by the city directly under the supervision of the board of public works and the provisions of subsections (2) and (3) of section 61.54 shall apply to the performance of such work."

to such competent and reliable bidder or to readvertise for proposals. Sec. 62.15(6), Stats.[4]

The board is to operate under the council's direction "to superintend all public works." Sec. 62.14(6), Stats. The council consists of the mayor and aldermen, but the mayor may only vote in case of a tie. Sec. 62.11(1), Stats. By the terms of the general charter law, specific council approval is not essential to the award of a public works contract. The council may, however, reject such an award for specified reasons by a two-thirds vote. Here the council elected to specifically approve the award. While the general corporate authority of the city is vested in the mayor and common council, the charter leaves the matter of awarding public works contracts up to the board under the council's direction. The statute has dealt with the subject of public works contracts in a most specific way, giving substantial support to a conclusion that the only inference possible is that this is an instance where the veto power exclusion is necessarily implied. Since the statutes do not require any council action prior to the letting of a public works contract, it may be presumed that the statute did not contemplate mayoral action in the awarding of public works contracts except the actual execution of the contract as provided by sec. 62.15 (12), Stats. If the mayor could veto the council's refusal to act on a contract award, he would become a one-person

---

[4] Sec. 62.15(6), Stats., provides as follows:

"(6) INCOMPETENT BIDDERS. Whenever any bidder shall be, in the judgment of said board, incompetent or otherwise unreliable for the performance of the work on which he bids, the board shall report to the council a schedule of all the bids for such work, together with a recommendation to accept the bid of the lowest responsible bidder, with their reasons; and thereupon the council may direct said board either to let the work to such competent and reliable bidder or to readvertise the same; and the failure to let such contract to the lowest bidder in compliance with this provision shall not invalidate such contract or any special assessment made to pay the liability incurred thereunder."

council, subject only to the check of a veto override by three-quarters of the council, and this would clearly frustrate the specific direction of the statutory provisions providing for the letting of public works contracts. We note the board has unrestricted authority to reject a bid if, in its opinion, any combination has been entered into to prevent free competition. Sec. 62.15(5), Stats. If the mayor could veto the council's failure to reject a bid, the carefully prescribed two-thirds majority of the council needed to reject a bid would be reduced to one vote more than the one-quarter needed to affirm the mayor's veto. The legislature provided protection for the public treasury by insuring the contract would be let to the lowest responsible bidder unless two-thirds of the council concluded it was contrary to the public interest.

The statutory bidding procedures represent a balance of discretion at the municipal level and mandatory procedures designed to eliminate the potential for fraud and enhance the quality of public work. We have said:

"The object of statutory bidding requirements in connection with the letting of municipal contracts is to prevent fraud, collusion, favoritism, and improvidence in the administration of public business, as well as to insure that the municipality receives the best work or supplies at the most reasonable price practicable."

*Blum v. Hillsboro*, 49 Wis.2d 667, 671, 183 N.W.2d 47 (1971). *See also: Bechthold v. Wauwatosa*, 228 Wis. 544, 564, 277 N.W. 657, 280 N.W. 320 (1938) (on rehearing). We recognize the legislative intent in the general charter law as an appropriate mix of mandatory and discretionary acts under sec. 62.15, Stats., and conclude the mayor may not veto council action or inaction on public works contracts.

Since we conclude that the Mayor is without authority to veto the action or inaction of the Common Council, we are not obliged to consider the other arguments pre-

sented regarding the Mayor's alleged failure to file his objections with the City Clerk and the Mayor's failure to observe and enforce section 1.07(4)(e) of the Green Bay ordinances.

*By the Court.*—Judgment reversed and cause remanded for further proceedings not inconsistent with this opinion.